**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MICKEY OKEY BRYANT,**

**Plaintiff,**

**v.** **Case No.: 2:19-cv-00659**

**ANDREW SAUL,**
**Acting Commissioner of the**
**Social Security Administration,**

**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the

Commissioner's decision be **AFFIRMED,** and this case be **DISMISSED** and removed from the docket of the Court.

## I. Procedural History

On October 20, 2015, Plaintiff, Mickey Okey Bryant ("Claimant"), completed an application for DIB, alleging a disability onset date of August 10, 2014 due to "black lung, silicosis, arthritis, [carpal] tunnel, [and] depression." (Tr. at 231-32, 355). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 46). Claimant filed a request for an administrative hearing, which was held on February 27, 2018 before the Honorable David Read, Administrative Law Judge (the "ALJ"). (Tr. at 76-112). By written decision dated July 19, 2018, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 43-59). The ALJ's decision became the final decision of the Commissioner on July 12, 2019 when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's Complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Appeal, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II. Claimant's Background

Claimant was 47 years old on his alleged onset date and 51 years old on the date of the ALJ's decision. He completed high school, communicates in English, and previously worked as a continuous mining operator and underground earth miner. (Tr. at 106, 354, 356).

## III. Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and

the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional area described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2019. (Tr. at 48, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 10, 2014, his alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: left shoulder tendonitis, degenerative joint disease, and impingement and pneumoconiosis. (*Id.,* Finding No. 3). The ALJ also considered Claimant's chronic knee pain, carpal tunnel syndrome, obesity, and depression, but the ALJ concluded that the impairments were non-severe. (Tr. at 49-50). The ALJ found that Claimant's hand injury, dizzy spells, and numbness in his feet were not medically determinable impairments. (Tr. at 49). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 51, Finding

No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional reaching overhead with the left dominant upper extremity, and frequent reaching in all other directions; and occasional exposure to dust, odors, fumes, and pulmonary irritants.

(Tr. at 51-53, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform his past relevant work. (Tr. at 53-54, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 54-55, Finding 7 through 10). The ALJ considered that (1) Claimant was born in 1967 and was defined as a younger individual age 18-49 on the alleged disability onset date, but subsequently changed age category to a person closely approaching advanced age; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 54, Finding 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a cafeteria attendant, production helper, and hand packager. (Tr. at 54-55, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 55, Finding No. 11).

## IV. Claimant's Challenges to the Commissioner's Decision

Claimant asserts four general challenges to the Commissioner's decision. (ECF No. 10 at 5-7). First, Claimant argues that the ALJ did not properly weigh the consultative

examiners' medical opinions regarding his upper extremity impairments. Second, Claimant contends that the ALJ did not specify an age category in the hypothetical that he posed to the vocational expert ("VE") or explain why he did not accept the VE's testimony that a person with Claimant's characteristics could not work if he could only occasionally reach with the left upper extremity. Third, Claimant states that the "ALJ never asked any questions" regarding his fatigue or depression. Fourth, Claimant asserts that the Appeals Council did not consider new evidence that he submitted.

In response to Claimant's assignments of error, the Commissioner argues that Claimant listed challenges, but only addressed one of them in the discussion section, which concerned how the ALJ weighed the opinion evidence. (ECF No. 11 at 10). Therefore, the Commissioner contends that Claimant waived all of the other assignments of error because he did not develop any of those arguments in his brief. (*Id.*). The Commissioner asserts that, even if the challenges were not waived, the ALJ properly weighed the medical opinions, stated Claimant's age and asked the VE to assume someone of his "same age" in the hypothetical that he posed, and was not bound by the VE's response to an occasional reaching RFC limitation that the ALJ did not find was supported by the record. Lastly, the Commissioner adds that the Appeals Council properly rejected late-filed evidence. (*Id.* at 10-16).

## V. <u>**Relevant Evidence**</u>

The undersigned considered all evidence of record and summarizes below the evidence that is most relevant to the issues in dispute. Claimant's challenges concern his upper extremity impairments, fatigue, and depression. Therefore, the summary focuses on those issues.

### *A. Treatment Records*

On August 4, 2015, Claimant presented as a new patient to family medicine physician, Amy Sayre, M.D., stating that he felt depressed since his wife's death in 2014. (Tr. at 458); *see* (Tr. at 436). Dr. Sayre diagnosed Claimant with depression and prescribed Zoloft. (Tr. at 459). Claimant followed up with Deanna Pauley, PA-C, on September 15, 2015, but he had not noticed much difference in his mood after taking Zoloft for six weeks. (Tr. at 456). However, during Claimant's next visit with PA-C Pauley on November 16, 2015, Claimant reported that Zoloft improved his mood, and he had no complaints. (Tr. at 463).

Claimant again told PA-C Pauley on August 22, 2016 that he felt much better since he started taking Zoloft, but was experiencing worsening left shoulder pain. (Tr. at 483). PA-C Pauley ordered a left shoulder x-ray and MRI, renewed Claimant's prescriptions for Mobic and Zoloft, and additionally prescribed prednisone. (Tr. at 484). A staff member administered injections of a steroid medication and nonsteroidal anti-inflammatory drug (NSAID) in Claimant's left shoulder. (*Id.*). On September 12, 2016, Claimant's left shoulder MRI was most indicative of tendonitis, and a possible supraspinatus tendon tear. (Tr. at 486). His x-ray showed some degenerative changes in his left shoulder and possible rotator cuff pathology. (Tr. at 487). Claimant continued to complain of shoulder pain to PA-C Pauley on December 1, 2016 and June 1, 2017. (Tr. at 478, 473). He participated in physical therapy at Southern West Virginia Physical Therapy for left shoulder impingement syndrome. On October 26, 2017, Claimant's physical therapist noted that Claimant had completed ten visits and made improvement in nearly all objective measurements, but still had large deficits in abduction and flexion. (Tr. at 529). The therapist rerecommended continued therapy. (*Id.*).

On January 8, 2018, family medicine physician, Brandy Vannatter, D.O., administered a Purdue Pegboard test to assess Claimant's finger and hand dexterity due to his reported bilateral carpal tunnel syndrome. (Tr. at 587). Dr. Vannatter stated that Claimant's scores were less than 25 percent of the national average. (*Id.*).

***B. Evaluations and Opinions***

On March 8, 2016, Nicole M. Smith, M.A., performed an Adult Mental Status Examination of Claimant. She noted that Claimant had been prescribed Zoloft by his primary care physician for the past 18 months, and it helped his depression symptoms. (Tr. at 437). Claimant had two or three close friends, and his activities included shopping in the grocery store weekly; "a little" weed eating; running errands, mostly on a monthly basis; eating in restaurants twice per month; visiting with his brother or adult children sometimes; answering the telephone; woodworking; managing his finances; "some" cooking; performing self-care independently; doing laundry; washing dishes; sweeping; watching television; sitting on the porch; taking his minor daughter to the bottom of the hill to catch the bus and picking her up after school; and caring for his five chihuahuas. (Tr. at 436, 438-39). Ms. Smith diagnosed Claimant with somatic symptom disorder with predominant pain that she rated as persistent and severe, and single episode moderate major depressive disorder. (Tr. at 438).

On March 24, 2016, Narendra Parikshak, M.D., assessed Claimant's physical RFC based upon her review of Claimant's records. She concluded that Claimant could perform work at the medium exertional level with frequent postural activities, except that he could only occasionally climb ladders, ropes, or scaffolds. (Tr. at 133-34). In addition, Dr. Parikshak opined that Claimant should avoid concentrated exposure to extreme cold, humidity, vibration, fumes, and hazards due to black lung disease and carpal tunnel

syndrome. (Tr. at 134-35).

On April 22, 2016, Deidre Parsley, D.O., performed an Independent Medicine Examination of Claimant. Claimant stated that he had carpal tunnel syndrome for the past 16 years, but it was never confirmed by electromyography (EMG). (Tr. at 445). On examination, Claimant did not have any redness, warmth, swelling, or tenderness in his hands. (Tr. at 447). He had a positive Tinel's sign on the left and positive Phalen's signs bilaterally. (Tr. at 448). Claimant had an old injury of the second metacarpophalangeal (MCP) joint of his left hand that was large and tender, and he had slightly decreased range of motion in his left index finger, which made it difficult for him to make a complete fist. (*Id.*). However, Claimant's sensation, grip strength, and fine manipulation were intact bilaterally. (*Id.*). He could write and pick up coins without difficulty. (Tr. at 447). Claimant also reported a history of silicosis and occupational pneumoconiosis after working in coal mines for 27 years. (Tr. at 448). However, his pulmonary examination and pulmonary function testing were normal. (*Id.*).

On May 12, 2016, Jeff Boggess, Ph.D., performed a psychiatric review technique based upon his review of Claimant's records. He assessed that Claimant had mild restriction in maintaining concentration, persistence, or pace and no restriction in activities of daily living or social functioning, and no episodes of decompensation of extended duration.[1] (Tr. at 132).

Uma Reddy affirmed Dr. Parikshak's RFC assessment on August 3, 2016, expect that she included additional environmental limitations, stating that Claimant should avoid concentrated exposure to extreme heat and even moderate exposure to fumes. (Tr.

[1] This opinion was issued before the "paragraph B" criteria were revised effective January 17, 2017.

at 149-50). Timothy Saar, Ph.D., affirmed Dr. Boggess's mental RFC assessment on August 4, 2016. (Tr. at 147).

***C. Claimant's Statements***

Claimant testified during his administrative hearing on February 27, 2018 that he stopped working because his wife died, and he was planning on quitting anyway because his body could not handle it anymore. (Tr. at 84). Regarding his hand impairments, Claimant stated that he suffered a mining accident ten years earlier in which a rock fell on his dominant left hand and it crushed the knuckle of his left index finger. (Tr. at 85, 87, 103). Claimant stated that, as a result, his index finger was numb all of the time, he lost motion in his middle finger, and he could not use his pinky. (Tr. at 87-88). Claimant additionally stated that his hands cramped due to carpal tunnel syndrome, and he suffered from weak grip, numbness, and loss of motion. (Tr. at 89-90). Claimant reported left shoulder pain and difficulty reaching with his left arm due to his shoulder impingement syndrome and partial rotator cuff tear. (Tr. at 88). In terms of mental impairments, Claimant testified that he suffered from depression since his wife died and he had no hope for tomorrow, had trouble focusing, and did not want to be around crowds. (Tr. at 95). He stated that he was also fatigued all of the time. (Tr. at 92). Claimant went to church once per week, but his 16-year-old daughter reportedly did all of the household chores. (Tr. at 95-96).

***D. Appeals Council Evidence***

On January 8, 2018, Dr. Vannatter examined Claimant at the request of Claimant's attorney and completed a physical RFC assessment form.[2] (Tr. at 114-22). She assessed

[2] Dr. Vannatter also administered the Purdue Pegboard Test on this date, but the score sheet for that test was included in the record before the ALJ. Dr. Vannatter's RFC opinion was not submitted until the decision reached the Appeals Council.

that Claimant could occasionally, but also frequently, lift less than 10 pounds; stand/walk for less than two hours in an eight-hour workday; and sit for less than six hours in an eight-hour workday. (Tr. at 115). Dr. Vannatter opined that Claimant's ability to push and pull with his upper extremities was limited due to left shoulder tendonitis with probable tear. (*Id.*). He could occasionally stoop, kneel, crouch, reach, handle, and finger, and never climb ramps, stairs, ladders, ropes, scaffolds; balance; or crawl. (Tr. at 116-17). Dr. Vannatter concluded that Claimant should avoid even moderate exposure to noise and all exposure to extreme cold, humidity, vibration, fumes, and hazards. (Tr. at 118).

On November 15, 2018, neurologist, Victor Jaramillo, M.D., examined Claimant and reviewed Claimant's nerve conduction studies, which were administered on October 30, 2018. (Tr. at 26-28). On examination, Claimant exhibited a sensory deficit to pinprick and positive Tinel's sign bilaterally, but his reflexes were normal. (Tr. at 18). Dr. Jaramillo diagnosed Claimant with bilateral carpal tunnel syndrome that was severe on the right and moderate on the left and mild early sensory motor polyneuropathy. (Tr. at 16). He referred Claimant to a neurosurgeon. (*Id.*).

## VI. <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. Discussion

Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in weighing certain medical opinions, relying on the VE's testimony, and not developing the record. In addition, Claimant contends that the Appeals Council should have considered new evidence that he submitted. Each argument is considered below, in turn.

### *A. Weight of Evidence*

Claimant asserts that the ALJ erred in giving significant weight to the opinion of the government's consultative examiner, Dr. Parsley, regarding Claimant's ability to use his hands, and the ALJ did not consider the contrary evidence from Claimant's expert, Dr. Vannatter. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his]

impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*[3]

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[4] and must explain the reasons for the weight given to the opinions.[5] "Adjudicators must

---

[3] The special deference afforded to medical opinions, even those submitted by a treating physician, was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's application was filed in 2015. Thus, the former rules applied in this case.

[4] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[5] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ first considered Claimant's hand impairments at step two of the sequential evaluation. The ALJ noted that Dr. Parsley diagnosed Claimant with carpal tunnel syndrome during the consultative examination, but the diagnosis was not confirmed by an EMG study and Claimant did not wear wrist braces, had not received injections, nor had he undergone carpal tunnel release surgery. (Tr. at 49). In fact, the ALJ noted that, other than Dr. Vannatter's unexplained and non-clinically correlated Purdue Pegboard score sheet, there was no medical evidence indicating treatment for carpal tunnel syndrome. (*Id.*). The ALJ found that the lack of treatment and evidence that Claimant could write and pick up coins during the consultative examination without difficulty was consistent with a finding that his carpal tunnel syndrome did not have more than a minimal effect on his ability to perform basic work activities and was thus

nonsevere. (*Id.*). The ALJ also considered Claimant's allegation that he suffered a work injury that "mashed" his left hand, but the ALJ noted that there was no medical evidence of record indicating a hand fracture or workplace injury or a diagnosis of hand injury. (*Id.*). Therefore, the ALJ concluded that the hand injury was not a medically determinable impairment. (*Id.*).

In the RFC analysis, the ALJ considered Claimant's allegations of hand numbness, cramps, and weakness, as well as a crushing injury to his left index finger. (Tr. at 52). However, the ALJ noted that Claimant's hobby was woodworking, which indicated a higher level of functioning than he alleged. (*Id.*). Also, the ALJ noted that, during his April 2016 consultative examination with Dr. Parsley, although Claimant had a positive Tinel's sign on the left and had difficulty making a fist with his left hand due to decreased flexion in his index finger, his grip strength was 5/5 bilaterally. (*Id.*). The ALJ noted that Claimant's counsel objected to inconsistencies in Dr. Parsley's examination findings, but the ALJ found that the issues were resolved in the summary section. (*Id.*).

The ALJ's foregoing analysis is supported by substantial evidence. Claimant was not treated for hand impairments during the relevant period. His hobby was woodworking, and neither of the state agency reviewing physicians assessed any manipulative limitations. (Tr. at 134, 150, 439). During his consultative examination, Claimant stated that he had carpal tunnel syndrome for the past 16 years, but it was never confirmed by EMG. (Tr. at 445). He had a positive Tinel's sign on the left and positive Phalen's signs bilaterally. (Tr. at 448). Claimant had an old injury of the second MCP joint of his left hand that was large and tender, and he had slightly decreased range of motion in his left index finger, which made it difficult for him to make a complete fist. (*Id.*). However, there was no redness, warmth, swelling, or tenderness in his hands; his

sensation, grip strength, and fine manipulation were intact bilaterally; and he could write and pick up coins without difficulty. (Tr. at 447, 448).

Claimant takes issue with the fact that Dr. Parsley noted his slightly decreased range of motion in his index finger in the physical examination findings, but she stated later in the same paragraph that his range of motion in all of his finger joints was normal. As the ALJ stated, Dr. Parsley resolved this perceived inconsistency in the summary section of the report by stating that Claimant had slightly decreased range of motion in his left index finger, which made it hard for him to make a fist. (Tr. at 448). Dr. Parsley did not indicate in her summary, nor did the ALJ consider, that Claimant had full range of motion in all of his fingers. Rather, the ALJ explicitly considered Claimant's slightly decreased range of motion in his left index finger, and the ALJ weighed that finding along with the other evidence that Claimant had full grip strength bilaterally and could write and pick up coins with either hand without difficulty. (Tr. at 49, 52). Therefore, the ALJ's decision to afford significant weight to Dr. Parsley's report was supported by substantial evidence.

As to the evidence from Dr. Vannatter, the only record before the ALJ was the January 2018 Purdue Pegboard score sheet, which stated that Dr. Vannatter was giving Claimant the manual dexterity test due to his bilateral carpal tunnel syndrome. (Tr. at 587). Dr. Vannatter noted a series of scores and stated that Claimant's scores were less than 25 percent than the national average. (*Id.*). Contrary to Claimant's assertion, the ALJ considered and weighed this evidence. As noted above, the ALJ found that the score sheet was unexplained and not clinically correlated. (Tr. at 49). This analysis is supported by the record. There was no evidence before the ALJ documenting treatment for carpal tunnel syndrome or objective testing regarding Claimant's hand impairments other than

Dr. Parsley's consultative examination. Any additional records from Dr. Vannatter were not submitted until after the ALJ's decision, and the ALJ could not have considered them. The ALJ weighed the only evidence from Dr. Vannatter that was before him, Claimant's Purdue Pegboard Test, against the fact that Claimant had not received any treatment related to his hands, maintained the hobby of woodworking, and had only slightly decreased range of motion in his left index finger during his consultative examination. Indeed, Claimant's sensation, grip strength, and fine manipulation were intact bilaterally during the examination, and Claimant could write and pick up coins with both hands without difficulty. (Tr. at 447, 448). Therefore, the ALJ appropriately considered and weighed the evidence from Dr. Vannatter.

Based on the above, the undersigned **FINDS** that the ALJ properly considered and weighed the opinion evidence in this matter, and the ALJ's assessment of the opinions is supported by substantial evidence.

***B. VE Testimony***

Claimant next asserts that the ALJ's decision is unsupported by substantial evidence because the ALJ did not specify an age category in the hypothetical that he posed to the VE, which was significant because Claimant was a younger individual age 18 to 49 at the time that he filed his application, but he was 50 by the date of the hearing and had progressed in age category to a "person closely approaching advanced age." Claimant further states that the ALJ did not explain why he found Claimant to be employable despite the VE's testimony that there would be no work for someone with Claimant's characteristics who could only occasionally reach with the left upper extremity.

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English*

*v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this case, the ALJ clarified on the record during Claimant's administrative hearing that Claimant was 50 years old, had a high school education, and previously worked as a continuous mining operator and was involved in underground earth mining. (Tr. at 106). The ALJ then asked the VE whether there were any jobs in the national economy that could be performed by a hypothetical individual of Claimant's "same age," education, and work experience, who was limited to light work with occasional reaching overhead with the dominant left arm, frequent reaching in all other directions with the dominant left arm, and occasional exposure to dust, odors, fumes, and pulmonary

irritants. (Tr. at 106-07). The VE responded that the person could work as a cafeteria attendant, production helper, or hand packager. (Tr. at 107-08). Claimant's attorney asked the VE a hypothetical that assumed the same characteristics, but counsel added that the person could only occasionally handle and finger with the left dominant hand and occasionally reach in all directions. (Tr. at 109). The VE stated that the additional limitations would preclude all jobs. (*Id.*). The ALJ asked if the person could work if he could frequently handle and finger with the left dominant hand and occasionally reach in all directions. (Tr. at 110). The VE stated that it would still preclude all work. (*Id.*).

Regarding Claimant's age category, the ALJ specifically clarified that Claimant was 50 years old immediately before asking the VE to assume someone of Claimant's "same age." (Tr. at 106). Therefore, the hypothetical posed to the expert clearly assumed an individual of Claimant's age on the date of the hearing, which fell within the closely approaching advanced age category. There is simply no merit to Claimant's assertion that there was any ambiguity in the age category of the hypothetical posed to the VE or in the VE's response to such hypothetical.

Further, regarding Claimant's ability to reach, the ALJ found Claimant's left shoulder tendonitis, degenerative joint disease, and impingement were severe impairments. (Tr. at 48). In the RFC analysis, the ALJ considered Claimant's allegations that his left shoulder hurt anytime that he moved it. (Tr. at 52). The ALJ noted that Claimant had some limitation in range of motion and reduced strength due to left shoulder pain. (Tr. at 53). The ALJ discussed medical imaging that was consistent with tendonitis and noted that Claimant's primary care provider recommended surgery for impingement syndrome, but there was no evidence that Claimant underwent surgery or that it was discussed any further. (*Id.*). The ALJ considered that Claimant was treated

with medication, a joint injection, and physical therapy. (*Id.*). Claimant reported improvement from physical therapy, but he still had some reduced range of motion in his left shoulder. (*Id.*). Based on such evidence, the ALJ restricted Claimant's RFC to light work with occasional overhead reaching with the left upper extremity. (*Id.*).

The ALJ's analysis regarding Claimant's ability to reach is supported by substantial evidence. There were no opinions in the record before the ALJ that assessed greater reaching limitations. In fact, the state agency physicians found that Claimant could perform a range of medium work without additional reaching limitations. (Tr. at 133-34, 149-50). The ALJ analyzed the relevant evidence and articulated well-reasoned support for his conclusion that Claimant could occasionally reach overhead with the left dominant upper extremity, but frequently reach in all other directions. Therefore, there was no justification for the ALJ to rely on the VE's responses to the hypothetical questions concerning an individual who could occasionally reach in all directions with the left dominant upper extremity. The ALJ's decision clearly justifies why such limitation was not supported by the objective medical record. Accordingly, the undersigned **FINDS** that the ALJ properly relied on the VE's testimony at steps four and five of the sequential evaluation.

***C. Duty to Develop the Record***

Claimant suggests that the ALJ should have questioned him regarding his allegations of fatigue and depression. (ECF No. 10 at 6). An ALJ's duty is to ensure that the record contains sufficient evidence upon which the ALJ can make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *see also Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009). Consequently, when examining the record to determine if it

was adequate to support a reasoned administrative decision, the court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

In this case, Claimant's counsel questioned Claimant about the effects of his fatigue and depression during Claimant's administrative hearing, and the record also contained Claimant's adult function report, clinical treatment notes, consultative physical and mental examination reports, and expert opinions. (Tr. at 92, 95, 132, 147, 149-50, 362-69, 435-41, 444-54, 456, 458, 463, 483). Therefore, there was no obligation for the ALJ to develop the record further, as the record contained sufficient evidence for the ALJ to evaluate the effects of Claimant's fatigue and depression. It is unclear what further information Claimant contends the ALJ should have developed. He does not identify any inadequacies or gaps in the record. The undersigned **FINDS** that the record was sufficient for the ALJ to make an informed decision and that there were not inadequacies or evidentiary gaps in the record for which the ALJ was obligated to develop the evidence.

***D. Appeals Council***

Claimant's final challenges to the Commissioner's decision argues that the Appeals Council should have considered the RFC opinion from Dr. Vannatter and treatment notes and nerve conduction studies from Dr. Jaramillo. (ECF No. 10 at 6, 7).

The Appeals Council will review a case if:

(1) There appears to be an abuse of discretion by the administrative law judge;
(2) There is an error of law;
(3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence;
(4) There is a broad policy or procedural issue that may affect the general public interest; or

(5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. § 404.970(a).

As indicated in the above-quoted text, a claimant must satisfy additional requirements in order for the Appeals Council to review a case on the basis of additional evidence. The Appeals Council must only consider a claimant's case on the basis of new evidence if the claimant shows good cause for not informing the SSA about or submitting the evidence earlier for one of three specified reasons. 20 C.F.R. § 404.970(b). A claimant can establish good cause by demonstrating that "[s]ome other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented [him] from informing [the SSA] about or submitting the evidence earlier." 20 C.F.R. § 404.970(b). Examples of such circumstance include, but are not limited to, serious illness, death of an immediate family member, accidental destruction of important records, a circumstance in which the claimant actively and diligently sought evidence from a source and the evidence was not received or received less than five business days prior to the hearing, or the claimant received a hearing level decision on the record and the Appeals Council reviewed the decision. *Id.* at § 404.970(b)(3).

In this case, the Appeals Council declined to review the ALJ's decision because it did not find that any of the reasons for review under 20 C.F.R. § 404.970(a) existed. (Tr. at 1). Regarding the new evidence from Dr. Vannatter, the Appeals Council found that it did not show a reasonable probability that it would have changed the outcome of the decision. (Tr. at 2). The Appeals Council found that the new evidence from Dr. Jaramillo

did not relate to the period under consideration. (*Id.*).

Claimant identifies no error in the Appeals Council's rejection of this evidence. Dr. Vannatter's RFC opinion was provided to Claimant's counsel on January 12, 2018. (Tr. at 122). However, the opinion was inexplicably not submitted to the SSA until after the ALJ's decision on July 19, 2018, although the ALJ specifically held the record open after Claimant's administrative hearing in order for Claimant to submit any additional evidence from Dr. Vannatter. (Tr. at 79, 111). Claimant does not indicate any good cause for not submitting Dr. Vannatter's RFC opinion earlier. In any event, the Appeals Council determined that the opinion would not have altered the ALJ's decision, and that finding is supported by substantial evidence. The ALJ considered the Purdue Pegboard score sheet completed by Dr. Vannatter. The late-filed RFC opinion that the Appeals Council rejected did not provide any additional explanation regarding that test, nor did it consist of Dr. Vannatter's examination findings, objective evidence, or any other records that undermined the ALJ's analysis of Claimant's upper extremity impairments or the Purdue Pegboard test results. Rather, the rejected evidence consisted solely of Dr. Vannatter's RFC opinion following her one-time examination of Claimant. As previously noted, the record contained RFC opinions from other medical sources, as well as an independent medicine examination report and Claimant's treatment records. There was no reasonable likelihood that the RFC opinion from Dr. Vannatter would have changed the ALJ's decision.

Regarding the evidence generated by Dr. Jaramillo, although those records were dated shortly after the ALJ's decision, Dr. Jaramillo did not indicate that any of the objective findings or test results related to Claimant's condition ***during*** the relevant period. Unquestionably, the examinations and motor nerve conduction studies were not

performed until after the period considered by the ALJ. (Tr. at 16-21, 26-38). Although "[n]ew evidence need not have existed on or before the date of the ALJ's decision," it must "shed light on the applicant's disability status during the relevant time period." *Woodson v. Berryhill*, No. 3:17CV347 (REP), 2018 WL 4659449, at *26 (E.D. Va. Aug. 7, 2018), *report and recommendation adopted,* 2018 WL 4658681 (E.D. Va. Sept. 27, 2018); *see also Sherry M. v. Saul*, No. 5:18-CV-00149, 2020 WL 1867988, at *10 (W.D. Va. Apr. 14, 2020) ("Evidence 'relates to' the relevant period if it provides additional insight into impairments, symptoms, or functional limitations that the claimant suffered while the ALJ was reviewing her case, even if the additional evidence was created after the ALJ issued her decision.") (citations omitted). Therefore, despite the temporal proximity of the records to the ALJ's decision, the Appeals Council appropriately concluded that the records did not relate back to the period of disability. *See, e.g., Woodson v. Berryhill,* No. 3:17CV347 (REP), 2018 WL 4659449, at *26 (finding that an opinion dated weeks after the ALJ's decision did not relate back to the relevant period because the examination was not performed until after the decision).

Moreover, there is no reasonable probability that the new evidence from Dr. Jaramillo would have changed the outcome of the decision, as required by 20 C.F.R. § 404.970(a). The evidence from Dr. Jaramillo noted a diagnosis of carpal tunnel syndrome and EMG results. However, the issue before the ALJ was whether that condition caused functional limitations. A diagnosis does not necessarily translate into loss of function. *Cowell v. Berryhill*, No. 2:17-CV-52-D, 2018 WL 7138018, at *5 (E.D.N.C. Dec. 13, 2018), *report and recommendation adopted,* No. 2:17-CV-52-D, 2019 WL 347245 (E.D.N.C. Jan. 28, 2019) (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (holding that the diagnosis of a condition, alone, is insufficient to prove disability, because there must

also be "a showing of related functional loss")).

There was evidence before the ALJ suggesting that Claimant had carpal tunnel syndrome, including positive Tinel's and Phalen's signs, and Claimant's statement that he suffered from the condition for 16 years. (Tr. at 445, 448). However, the ALJ noted that Claimant did not wear wrist braces, receive injections, or undergo carpal tunnel release surgery, and there was no evidence of treatment for the condition other than the Purdue Pegboard test. (Tr. at 49). The new evidence from Dr. Jaramillo does not change or undermine those findings. While it shows that Claimant's carpal tunnel syndrome was confirmed by EMG shortly after the ALJ's decision, it does not indicate any additional interventions or limitations. Dr. Jaramillo referred Claimant to a neurosurgeon, but there were no additional records of treatment. (Tr. at 16).

More importantly, while the ALJ referenced the lack of diagnosis as one reason that Claimant's hand impairments were non-severe and did not warrant RFC restrictions, the ALJ still focused the analysis of Claimant's hand impairments on his functional abilities. The ALJ relied on the fact that Claimant was a woodworker, could write and pick up coins without difficulty, and had full grip strength. (Tr. at 52). The record from Dr. Jaramillo does not contradict those findings. At most, the new evidence from Dr. Jaramillo could alter the step two analysis regarding whether Claimant had a severe hand impairment. However, there is simply no reasonable probability that it would impact any of the subsequent steps of the sequential evaluation, and result in a different decision, because it does not bear on the ALJ's functional analysis.

Therefore, the undersigned **FINDS** that the Appeals Council did not err in declining to review the ALJ's decision on the basis of new evidence from Dr. Vannatter and Dr. Jamarillo.

## VIII. Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 17, 2020

Cheryl A. Eifert
United States Magistrate Judge